IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03248-MEH

MAURICE AMBROSE GAYE,

      Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

      Defendant.

---

# ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Plaintiff, Maurice Ambrose Gaye, appeals from the Social Security Administration ("SSA")

Commissioner's final decision denying his application for disability insurance benefits ("DIB"),

filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and his application for

supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security

Act, 42 U.S.C. §§ 1381-1383c.  Jurisdiction is proper under 42 U.S.C. § 405(g).  The parties have

not requested oral argument, and the Court finds it would not materially assist in its determination

of this appeal.  After consideration of the parties' briefs and the administrative record, the Court

affirms in part and reverses in part the ALJ's decision and remands the Commissioner's final order.[1]

---

[1]The parties consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c) and
D.C. Colo. LCivR 72.2.  Docket #17.

**BACKGROUND**

I.      **Procedural History**

Plaintiff seeks judicial review of the Commissioner's decision denying his applications for

DIB and SSI benefits filed on January 21, 2011. [AR 217-229]  After the applications were initially

denied on July 5, 2011 [AR 115-118], an Administrative Law Judge ("ALJ") scheduled a hearing

upon the Plaintiff's request for January 7, 2013 [AR 36-69].   After receiving testimony from the

Plaintiff, the ALJ determined that he required a consultative examination, so continued the hearing

pending such exam. [AR 67] Thereafter, the Plaintiff and a vocational expert testified at the

continued hearing on May 20, 2013. [AR 70-92]  The ALJ issued a written ruling on June 3, 2013

finding Plaintiff was not disabled since September 17, 2010, because considering Plaintiff's age,

education, work experience and residual functional capacity, there were jobs existing in significant

numbers in the national economy that Plaintiff could perform.   [AR 14-35]  The SSA Appeals

Council  subsequently  denied  Plaintiff's  administrative  request  for  review  of  the  ALJ's

determination, making the SSA Commissioner's denial final for the purpose of judicial review [AR

1-4].  *See* 20 C.F.R. § 416.1481.  Plaintiff timely filed his complaint with this Court seeking review

of the ALJ/Commissioner's final decision.

II.     **Plaintiff's Alleged Conditions**

Plaintiff was born on March 4, 1976; he was 34 years old when he filed his applications for

DIB and SSI benefits in January 2011.  [AR 217-229]  Plaintiff claims he became disabled on

September 17, 2010 and reported that he was limited in his ability to work by "back problems, feet

problems, [and] head injury."  [AR 273]

With respect to Plaintiff's back problems, the record reflects he had a work-related back injury on September 17, 2010, the date listed as the onset of his disability. [AR 371] An MRI of Plaintiff's back on October 11, 2010 revealed a "[s]evere right lateral recess stenosis at L5-S1 owing to an inferiorly migrated right central disc extrusion contributing to probable right S1 radiculopathy. Both L5-S1 neuroforamina are also moderately narrowed." [AR 335] On October 13, 2010, Plaintiff's worker's compensation physician, Paul Ogden, M.D., referred him to a spine specialist, Gary Ghiselli, M.D., who, on October 21, 2010, assessed Plaintiff with a "right-sided L5-S1 extruded disc fragment [and] right S1 radiculopathy" and recommended Plaintiff undergo a "right L5-S1 microdisectomy." [AR 429-430]  Plaintiff underwent the procedure with no complications on November 24, 2010 [AR 472-473] and his leg pain improved, but he still had pain in his lower back. [AR 348]

After months of no improvement with medication or physical therapy, Plaintiff presented for a "impairment assessment" on March 14, 2011 at which John Aschberger, M.D. determined Plaintiff was "at maximum medical improvement," primarily due to his lower back pain, failure to progress in therapy, ineligibility for further surgical intervention, and lack of interest in medication to control nerve irritation. [AR 416-417] At a "recheck" appointment with Dr. Ogden, Plaintiff expressed his preference for "no further intervention" and stated "his previous job had been difficult with his foot problems even before the back injury." [AR 394]  The following week, Plaintiff declined Dr. Ogden's suggestions for further efforts to alleviate the pain, but asked for additional narcotic medications.  [AR 393]  Dr. Ogden restricted Plaintiff "permanently" to "light work duty," lift 10 pounds frequently, 20 pounds occasionally," and "position changes as needed." [*Id.*]

3

Plaintiff presented to Stuart L. Kutz, Jr., Ph.D., for a mental status examination on May 2, 2011, at which he reported to Dr. Kutz that in or about 2000, he was assaulted so severely that he was "left for dead," suffered a coma for several weeks, and required surgery to repair a skull fracture and foot problems resulting from frostbite. [AR 431-437] Plaintiff also reported that he attempted suicide in 2010 [AR 432]; however, the records from that incident on January 16, 2010 indicate the Plaintiff denied suicidal ideation, but "drank 5 beers" and "did something stupid" by taking an overdose of aspirin and naproxyn. [AR 380]

After a thorough mental examination and intelligence test, Dr. Kutz diagnosed Plaintiff with mood disorder, nos, and post-traumatic stress disorder, mild to moderate, and assessed a Global Assessment of Functioning (GAF) score of 60.[2] [AR 436-437]

---

[2]In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit describes the GAF as follows:
The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":
• 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."
• 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."
• 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."
• 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."
• 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic

The next record, dated more than a year later on June 13, 2012, is a "Transport Health Summary Form" from Aurora City Jail reflecting Plaintiff's transport to Arapahoe County Jail and his reports of medical problems as "arthritis" and "drug abuse." [AR 496] The next day, for his initial screening at Arapahoe County, Plaintiff reported he had never attempted to commit suicide and he had no health problems, except "surgeries for nerve damage both feet" and "r[igh]t jaw swollen." [AR 495]

Plaintiff presented next to Denver Health Medical Center on September 30, 2012 after a potential suicide attempt by hanging. [AR 449-453] However, Plaintiff reported that he had drunk 10 beers and 2 "shots" of alcohol, "did not want to die," and performed the attempt with his girlfriend watching because he "wanted her attention." [AR 448, 453] Plaintiff was discharged the

---

attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
• 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."
• 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."
• 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."
• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."
• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."
• 0: "Inadequate information."

next day with a diagnosis of major depressive disorder, severe, generalized anxiety disorder, cannabis abuse, and alcohol abuse, and assessed a GAF of 50. [AR 445] The doctor, Abraham Nussbaum, noted that Plaintiff exhibited no signs of psychotic disorder, he affirmatively declined additional treatment for depression, and he reported his pleasure at failing to complete the suicide attempt citing his "employment, his strong desire to provide for his family, his religious faith, and his sense he could lose more if he were to attempt suicide again." [AR 446]

At the ALJ's request, Plaintiff presented to Peter Weingarten, M.D. on January 23, 2013 for a consultative physical examination. [AR 502-503]  Plaintiff reported to Dr. Weingarten that he had not worked since his back injury in 2010 and had continued "severe low back pain" and "constant pain" in his feet following surgery for frostbite in 2004. [*Id.*] Dr. Weingarten noted that Plaintiff denied all other health problems and was wearing an "ankle bracelet because of a driving offense." [*Id.*] After an examination, Dr. Weingarten concluded that Plaintiff could lift and carry up to 20 pounds frequently and up to 50 pounds occasionally; could sit for eight hours, but stand and walk for only one hour at a time; had no limitations with the use of his hands and could operate foot controls frequently; could not perform postural activities such as climbing, balancing, crouching and crawling; could not work at unprotected heights or move mechanical parts, but could operate a motor vehicle occasionally; and could perform basic activities like shop, prepare a meal, travel, use public transportation, and care for personal hygiene. [AR 504-509]

III.    **Hearing Testimony**

At the initial hearing on January 7, 2013, the Plaintiff, his counsel, and vocational expert Ashley Bryers appeared. [AR 36-69] The Plaintiff testified that in April and June/July of 2012, he

worked part-time for Steve Knuth Construction as a "cleaner"; he also worked a total of 30 days in 2012 for Temporary Services as a "sweeper"; he received worker's compensation for his back injury in 2010 until March 2011 when he settled the claim; he had constant pain in his lower back that traveled down into his right leg; because of the pain, he had difficulty sitting for longer than 15-20 minutes at a time; he could stand for 30-45 minutes, but then would need to lay down 10 times for approximately five hours in a given day; because of nerve damage in his feet, he could walk only with shoes on, but his feet hurt when he walked; he had not sought medical treatment because he could not afford it and did not understand how health insurance worked until recently when he applied for the Colorado Indigent Care program; he had migraines from his previous head injury 3-4 times per week for 2-4 hours each time; if he worked an 8-hour day for the temporary agency, he could not get out of bed the next day; he attempted suicide in September 2012 because he was upset about not being able to work; his previous suicide attempt was due to his mother and brother dying in 2007 or 2008; and he does not claim to be "totally disabled" but his ability to work a full day is affected by his pain.  [AR 41-65]

At the second hearing on May 20, 2013, the Plaintiff, his counsel, and vocational expert Pat Paulini appeared.  [AR 70-92]  The Plaintiff testified that sitting was painful for his back and standing was painful for his feet; he could not watch a movie without needing to lay down; he could not bend over to pick up something from the ground; the pain in his back had gotten gradually worse since surgery in 2009; he needed to lay down 15-20 times per day; he could work one day, then needed two days to recover; he could walk for 20 minutes before having pain in his feet and back; and his pain at its worst was an 8 out of 10. [AR 684-707]

Ms. Paulini testified that an individual with Plaintiff's age, experience and education – limited to a light exertional level with the option to sit or stand at will – could perform the position of surveillance system monitor.  Further, Ms. Paulini testified an individual with Plaintiff's age, experience and education – who could lift and carry 20 pounds, sit eight hours and stand/walk during an eight-hour workday, never climb, balance, stoop, kneel, crouch or crawl; never tolerate work at unprotected heights or around moving mechanical parts, and could occasionally operate a motor vehicle – could perform the jobs of telephone quotation clerk and ticket checker.  [AR 87-88] She affirmed that bending at the waist, stooping, and filing were not essential requirements of these positions. [AR 89-90]

The ALJ issued an unfavorable decision on June 3, 2013.  [AR 14-30]

## LEGAL STANDARDS

**I.     SSA's Five-Step Process for Determining Disability**

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity.  If he is, disability benefits are denied.  *See* 20 C.F.R. §§ 404.1520, 416.920.  Step Two is

a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is unable to show that his impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. *See* 20 C.F.R. 404.1520(c). Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment is not listed, he is not presumed to be conclusively disabled. Step Four then requires the claimant to show that his impairment(s) and assessed residual functional capacity ("RFC") prevent him from performing work that he has performed in the past. If the claimant is able to perform his previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## II.    Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001). Thus, the function of the Court's review is "to determine whether the findings of fact ... are based upon substantial evidence and inferences reasonably drawn therefrom.

If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)). However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since the disability onset date of September 17, 2010 (Step One). [AR 19] Further, the ALJ determined that Plaintiff had the following severe impairments: status post lumbar disc surgery; a history of frostbite with residual bilateral foot deformities; and headaches (Step Two). [AR 20] The ALJ found Plaintiff's mental impairments to be "nonsevere," saying "[t]he claimant's medically determinable mental impairments of a mood disorder, not otherwise specified, posttraumatic stress disorder (PTSD), and a rule-out of a cognitive disorder, not otherwise specified, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities." [AR 20]

Next, the ALJ found that Plaintiff did not have an impairment or combination of impairments

10

that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three).  [AR 22]

The ALJ then determined that Plaintiff had the RFC to perform "medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant can lift and carry up to 50 pounds occasionally and 20 pounds frequently; the claimant can stand for one hour during an 8-hour workday and can walk for one hour during an 8-hour workday; the claimant can sit for 8 hours per 8-hour workday; the claimant should never be required to climb, balance, stoop, kneel, crouch, or crawl; the claimant should avoid any exposure to unprotected heights, moving mechanical parts; and can tolerate no more than occasional operation of a motor vehicle as a requirement of the job." [AR 23]  The ALJ determined that the record reflects Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." [AR 25]

The ALJ went on to determine that Plaintiff had no past relevant work (Step Four), and that considering Plaintiff's age, education, work experience and residual functional capacity, Plaintiff could perform jobs existing in significant numbers in the national economy (Step 5).  [AR 28-29] As a result, the ALJ concluded that Plaintiff was not disabled at Step Five of the sequential process and, therefore, was not under a disability as defined by the SSA. [AR 30]

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the following errors: (1) the findings of the ALJ regarding credibility are not based on substantial evidence; (2) the ALJ erred by failing to apply the "treating

physician rule" to the evidence regarding Plaintiff's RFC to sit, stand and walk, and his need to change positions at will; (3) the ALJ erred when he failed to find that Plaintiff's mental impairments are severe, and, even if they are not severe, failed to place restrictions related to them in the RFC; and (4) the ALJ erred when he determined that the Commissioner met the burden of proving there are jobs available in the national economy that are within Plaintiff's restrictions and that finding is not supported by substantial evidence or adequate findings of fact.

## ANALYSIS

The Court will address each of Plaintiff's issues in turn.

## I.      Whether ALJ's Credibility Findings are Based on Substantial Evidence

Plaintiff argues that the ALJ's statements concerning his credibility were "merely conclusions in the guise of findings," and "not supported by substantial evidence."

Once objective medical evidence shows that a claimant has an impairment that can reasonably be expected to produce symptoms, the ALJ is required to consider the claimant's assertions of the symptoms and decide whether to believe them. *Thompson v. Sullivan*, 987 F.2d 1482, 1489 (10th Cir. 1993). "Credibility determinations are peculiarly the province of the finder of fact, and [the Tenth Circuit] will not upset such determination when supported by substantial evidence." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (internal quotation marks omitted). But "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.* (internal quotation marks omitted). "An ALJ must do more than simply recite the general factors he considered without referring to any specific evidence." *Smith v. Colvin*, -- F. App'x --, 2015 WL 5315660, at *3 (10th Cir. Sept. 14, 2015)

(quoting *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000)) (internal quotations and brackets omitted).   "*Kepler* does not, however, require a formalistic factor-by-factor recitation of the evidence. So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied." *Id.*

With respect to the Plaintiff's credibility, the ALJ found:

> In terms of the claimant's alleged limitations, the undersigned notes that the claimant testified that he injured his head in 2000 and his feet in 2004, but was able to return to full-time work despite his feet and migraine headaches. He further testified that he has always worked and was moving up in his last job; however, the undersigned notes limited earnings in the claimant's work history including no earnings in 2005 and minimal earnings in 2002 and 2003. (Exhibit 8D) The undersigned further notes that the claimant has a significant criminal history, including charges of larceny, forgery, attempted murder, cruelty to a child on multiple occasions, fraud, filing false reports, and receiving stolen property. (Exhibit 9F/9) In fact, the claimant reported to emergency room staff at the University of Colorado Hospital in June 2010 that he "has limited employment options due to [history] of incarceration" and not because of any physical or mental impairment. (Exhibit 3F/l 6) The undersigned further notes that despite the claimant's testimony that he has been unable to afford treatment or medications; the claimant has been able to afford marijuana, which he acknowledged as his "drug of choice," has been able to afford cocaine, as well as drinking alcohol every one to two days during the period of alleged disability. (See Id.; see also Exhibit 7F) Such an ability to purchase alcohol, cocaine and marijuana is inconsistent with the claimant's allegation that he has been unable to afford treatment or prescription medications for his alleged symptoms. Regarding his suicide attempt, the undersigned notes that the evidence shows the claimant reported that he attempted suicide because of a "conflict" with his brother and girlfriend (Exhibit 7F/5) Further, the claimant was noted to have been intoxicated at the time of his suicide attempt after using alcohol, cocaine and cannabis. In addition, the undersigned notes that the claimant's testimony has been inconsistent. At the first hearing, the claimant testified that he could sit and stand for equal periods. However, at the supplemental hearing after his consultative examination, the claimant testified that sitting causes him "the most unbearable pain." Moreover, the claimant testified that he lies down five hours per day on approximately five or six days per month during "bad days." However, at the supplemental hearing, the claimant testified that he needs to lie down "15 to 20 times" each day. He further stated that only "sometimes" does he have good days, as opposed to the opposite testimony he

provided at the first hearing, and the claimant never reported such a frequency of lying down to any treating source including the physical consultative examiner. The undersigned also notes that the claimant was able to sit in no apparent distress through the first hearing, which lasted approximately 45 minutes from 10:45 am to 11:30 am. The undersigned finds that such inconsistencies in the claimant's testimony and in the medical evidence diminish the credibility of his allegations.

. . .

The undersigned notes that the claimant has received little, if any, treatment since his [sic] declined any additional treatment through his workers' compensation claim. In fact, the claimant's testimony that he has been to the emergency room approximately ten times is unsupported by the evidence of record. Moreover, despite the claimant's alleged severity of his migraine headaches, he is not treated with any prescription medication nor has he reported to urgent care, emergency rooms or any other facility for his migraine headaches. While the claimant alleged an inability to afford treatment, the undersigned notes that the claimant received a settlement from workers' compensation and was able to spend money on cocaine, marijuana and alcohol. The undersigned further notes that the claimant has continued to work significantly physical jobs through a temporary labor agency as well as a friend's construction company. The claimant has also received unemployment benefits after his alleged onset of disability where he certified that he was ready, willing and able to work a full -time job. While application for and receipt of unemployment does not preclude entitlement or eligibility for disability benefits, the undersigned must evaluate the receipt of unemployment compensation as a factor considered under "the totality of the circumstances." The undersigned further notes the claimant's own report to the emergency room physician at the University of Colorado Hospital that he has had difficulty obtaining employment because of his criminal history, which was quite significant according to the Arapahoe City [sic] Sheriff' s Office. (Exhibit 9F) In addition to his work activity and seeking employment, the record shows that the claimant felt well enough to play basketball with his children. In considering these factors with the claimant's overall lack of medical treatment since March 2011, his work activity, his receipt of unemployment benefits, and the claimant's decision to stop his worker's compensation treatment before "all possible attempts to improve his pain" were exhausted; the undersigned finds that the claimant is capable of a greater functional capacity than alleged.

[AR 25, 27] Plaintiff contends that the ALJ's finding concerning inconsistent testimony regarding Plaintiff's need to lie down is improper because the testimony is actually consistent, in that lying down five hours per day (first hearing) is the same as lying down 15 times per day for 20 minutes

at a time (second hearing).  Plaintiff also contends that there is no relevant inconsistency in any reports he made to ER staff regarding an inability to work in June 2010, since his disability onset date was September 17, 2010.  Further Plaintiff states that his testimony regarding sitting and standing at the first and second hearings was completely consistent, and the ALJ's reference to cocaine abuse was not supported by the 2012 record showing no cocaine use at that time.  Finally, Plaintiff states that his decision to forego further "possible" back treatment in March 2011 should not be considered for credibility purposes, since the regulations require only that claimants follow "prescribed" treatment that is "clearly expected to restore a claimant's capacity to engage in substantial gainful activity."

Defendant counters that the ALJ properly considered the Plaintiff's work history to determine Plaintiff's ability to work; the Plaintiff's receipt of unemployment benefits through 2012 for which Plaintiff held himself out as able to work; the Plaintiff's convictions for forgery, fraud and filing false reports which is proper in determining a claimant's intent to deceive; the Plaintiff's admission that he regularly used marijuana which undermines his testimony that he could not afford medical care; the inconsistency between Plaintiff's testimony that he needed to lie down several times a day and the lack of any such reports in the medical record; the Plaintiff's appearance at the first hearing in being able to sit for 45 minutes without distress; the inconsistency between Plaintiff's testimony that he visited the emergency room "ten times" and the documentary record reflecting only one visit to the ER; the Plaintiff's admission that despite disabling pain, Plaintiff was able to play basketball with his children; and the limited medical treatment and lengthy gaps in treatment, and the fact that Plaintiff sought no treatment for his alleged migraines.

The Court finds that the ALJ's credibility findings meet the requirements of *Kepler* and *Qualls*. In fact, in *Newbold v. Colvin*, 718 F.3d 1257, 1267 (10th Cir. 2013), the Tenth Circuit found the "ALJ cited a number of grounds, tied to the evidence, for his adverse credibility finding," including the inconsistencies between the plaintiff's alleged pain and her daily activities, the objective medical evidence, her expressions of interest in returning to work and school, and the lack of treatment for a period of fourteen months. *Id.* at 1267-68; *see also Qualls*, 206 F.3d at 1372 ("[T]he ALJ did not simply recite the general factors he considered, he also stated what specific evidence he relied on in determining that [the claimant's] allegations of disabling pain were not credible.").

Likewise, here, the ALJ cited to specific evidence to support his credibility findings, including the inconsistencies between Plaintiff's statements of physical pain/limitations and his attempt to play basketball with his children and work in day-labor construction jobs; his statement that he had been to the emergency room "ten times" was unsupported by the record; his decision to decline further medical treatment after back surgery despite his doctor's belief that all possible attempts to improve Plaintiff's pain had not been tried [AR 393]; his certifications to the Colorado Department of Labor through 2012 that he was "ready, willing and able to work a full-time job"; and his failure to seek treatment for his back or foot pain after March 2011. In fact, in June 2012, Plaintiff's reported medical problems were "arthritis" and "drug abuse" [AR 496], and for his initial screening at Arapahoe County Jail, Plaintiff reported he had never attempted to commit suicide and he had no health problems, except "surgeries for nerve damage both feet" and "r[igh]t jaw swollen." [AR 495]

16

Plaintiff argues that the ALJ's considerations of Plaintiff's report to a doctor before the disabling injury occurred and of the apparent inconsistencies between Plaintiff's testimony at the first hearing and the second hearing regarding his ability to sit and stand are incorrect and, thus, the ALJ's credibility findings are not supported.  The Court disagrees as to the Plaintiff's interpretation of the record in certain respects; for example, the record is clear that Plaintiff declined to participate in further treatment of his back pain in March 2011 (four months post-surgery) after only attempting certain restorative measures and not others, and he even refused further medications except narcotics.  [AR 393] In addition, as to Plaintiff's suggestion that the ALJ was "influenced" by Plaintiff's drug use, the ALJ specifically noted that "despite his substance usage he has maintained the ability to perform work within the [RFC] as set forth above. Thus, the claimant's drug and alcohol usage is not material to this finding as supported by his treatment records." [AR 28]

Even if certain of the ALJ's findings may be inaccurate, however, the Court concludes that those ALJ's adverse credibility findings listed herein are supported by substantial evidence, particularly in the documentary record.  *See Smith*, -- F. App'x --, 2015 WL 5315660, at *3 (quoting *Qualls*, 206 F.3d at 1372) ("So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied.").  The Court finds no basis on which to reverse the ALJ's credibility findings here.

## II.    Whether ALJ Erred in Failing to Apply "Treating Physician Rule"

Plaintiff contends the ALJ erred by not giving the opinion of his treating physician, Dr. Ogden, controlling weight under the law.

According to the "treating physician rule," the Commissioner will generally "give more

weight to medical opinions from treating sources than those from non-treating sources." *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c)(2).  In fact, "[a] treating physician's opinion must be given substantial weight unless good cause is shown to disregard it." *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 289-90 (10th Cir. 1995).  A treating physician's opinion is accorded this weight because of the unique perspective the doctor has to medical evidence that cannot be obtained from an objective medical finding alone or from reports of individual examinations.  *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).

When assessing how much weight to give a treating source opinion, the ALJ must complete a two-step inquiry, each step of which is analytically distinct.  *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).  The ALJ must first determine whether the opinion is conclusive – that is, whether it is to be accorded "controlling weight" on the matter to which it relates.  *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *accord Krauser*, 638 F.3d at 1330.  To do so, the ALJ:

> must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. If the answer to this question is 'no,' then the inquiry at this stage is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. [...] [I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight.

*Watkins*, 350 F.3d at 1300 (applying Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *2) (internal quotation marks and citations omitted); *accord Mays v. Colvin*, 739 F.3d 569, 574 (10th Cir. 2014); *see also* 20 C.F.R. § 404.1527(d)(2).

If, however, a treating physician's opinion is not entitled to controlling weight, the ALJ must

proceed to the next step, because "[t]reating source medical opinions are still entitled to deference

and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." *Watkins*, 350 F.3d

at 1300; *see also Mays*, 739 F.3d at 574.   At the second step, "the ALJ must make clear how much

weight the opinion is being given (including whether it is being rejected outright) and give good

reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight

assigned." *Krauser*, 638 F.3d at 1330.   If this is not done, remand is mandatory. *Id.*  As SSR 96-2p

explains:

> Adjudicators must remember that a finding that a treating source medical opinion is
> not well-supported by medically acceptable clinical and laboratory diagnostic
> techniques or is inconsistent with the other substantial evidence in the case record
> means only that the opinion is not entitled to "controlling weight," not that the
> opinion should be rejected. Treating source medical opinions are still entitled to
> deference and must be weighed using all of the factors provided in [§§] 404.1527 and
> 416.927. In many cases, a treating source's medical opinion will be entitled to the
> greatest weight and should be adopted, even if it does not meet the test for
> controlling weight.

*Id.* (citing SSR 96-2p, 1996 WL 374188, at *4).   Hence, the absence of a condition for controlling

weight raises, but does not resolve the second, distinct question of how much weight to give the

opinion. *Krauser*, 638 F.3d at 1330-31 (citing *Langley*, 373 F.3d at 1120) (holding that while

absence of objective testing provided basis for denying controlling weight to treating physician's

opinion, "[t]he ALJ was not entitled, however, to completely reject [it] on this basis")). In weighing

the opinion, the ALJ must consider the following factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the
> nature and extent of the treatment relationship, including the treatment provided and
> the kind of examination or testing performed; (3) the degree to which the physician's

19

opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1331.  In applying these factors, "an ALJ must 'give good reasons in the notice of determination or decision' for the weight he ultimatel[y] assign[s] the opinion." *Watkins*, 350 F.3d at 1300 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also* SSR 96-2p, 1996 WL 374188, at *5; *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003).  Without these findings, remand is required. *Watkins*, 350 F.3d at 1300–01; *accord Krauser*, 638 F.3d at 1330.  Finally, if the ALJ rejects the opinion entirely, he must give "specific, legitimate reasons" for doing so.  *Watkins*, 350 F.3d at 1301.

First, the Court finds the ALJ properly found Dr. Ogden's opinion was not entitled to controlling weight.  The entirety of Dr. Ogden's opinion – "Permanent work restrictions are light work duty. Ten pound lift frequently. 20 lb. lift occasionally. Position changes as needed." – came after an "extensive discussion" with Plaintiff about his continuing back pain, his attempt to play basketball with his children ("after a short time his back was hurting worse"), and his denial of all further treatments except narcotics. [AR 393] Thus, the Court cannot conclude Dr. Ogden's opinion was "well-supported by medically acceptable clinical and laboratory diagnostic techniques." *See Watkins*, 350 F.3d at 1300.

Second, the Court finds the ALJ gave good reasons for giving Dr. Ogden's opinion "some weight." [*See* AR 27] In noting that "the claimant failed to comply with the treatment regimen as he declined any further treatment prior to exhausting all possible attempts to improve his pain," and

20

that "the claimant was only five [sic] months status post his lumbar surgery at the time these restrictions were given and had no subsequent treatment," the ALJ considered the length of the treatment relationship (the Court notes Plaintiff was actually closer to four months post-surgery), the nature and extent of the treatment provided, and the consistency between the opinion and the evidence as a whole.   Moreover, the fact that Dr. Ogden's opinion is consistent with Dr. Aschberger's [AR 416-417] justifies the ALJ's finding giving the opinion some weight.

The Court finds the ALJ properly applied the treating physician rule to Dr. Ogden's opinion and, thus, finds no basis on which to reverse the ALJ's decision here.

### III.  Whether ALJ Erred in Finding Plaintiff's Mental Impairments "Nonsevere" at Step 2

Plaintiff contends that the ALJ erred in failing to deem Plaintiff's mental impairments "severe" at Step 2 and, even if not severe, the ALJ failed to place restrictions in the RFC based on the mental impairments.

Pursuant to 20 C.F.R. § 404.1520(a)(4)(ii), at the second step of the sequential evaluation process, an ALJ is required to determine whether a medically determinable impairment may be classified as severe and whether such impairment meets the duration requirement of 42 U.S.C. § 423(d)(1)(A), which provides:

(1) The term "disability" means--

(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

"A physical or mental impairment must be established by medical evidence consisting of

signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 404.1508.  Section 404.1508 provides that a claimant's "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."  More specifically, "symptoms" are the claimant's description of his/her own physical or mental impairments; "signs" are anatomical, physiological, or psychological abnormalities that can be observed apart from symptom descriptions and must be shown by medically acceptable clinical diagnostic techniques; and "laboratory findings" are anatomical, physiological or psychological phenomena that can be shown by use of medically acceptable laboratory diagnostic techniques.  20 C.F.R. § 404.1528.

An ALJ's omission of an impairment altogether could be reversible error.  "It is beyond dispute that an ALJ is required to consider all of the claimant's medically determinable impairments, singly and in combination; the statute and regulations require nothing less. ... Further, the failure to consider all of the impairments is reversible error."  *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006) (citations omitted); *see also Wells v. Colvin*, 727 F.3d 1061, 1069 (10th Cir. 2013) (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)) ("In his RFC assessment, the ALJ must consider the combined effect of *all* medically determinable impairments, whether severe or not.") (emphasis in original).

In this case, the ALJ did not omit consideration of the Plaintiff's mental impairments altogether; rather, he acknowledged Plaintiff's "mood disorder, nos, PTSD, and a rule-out of a cognitive disorder" at Step 2 and determined them to be "nonsevere." [AR 20]  Defendant cites the Tenth Circuit's opinion in *Carpenter v. Astrue* for the proposition that, even if the ALJ errs in

finding an impairment not to be severe at Step 2, such error is harmless if the ALJ proceeds to the remaining steps of the evaluation and considers both severe and non-severe impairments in fashioning the RFC.  The Court agrees.[3]  "An error at step two of the sequential evaluation concerning one impairment is usually harmless when the ALJ, as occurred here, finds another impairment is severe and proceeds to the remaining steps of the evaluation." *Grotendorst v. Astrue*, 370 F. App'x 879, 883 (10th Cir. 2010) (citing *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008)).

Here, at Step 2, the ALJ found that Plaintiff's "medically determinable mental impairments cause[d] no more than 'mild' limitation" and, thus, the ALJ found them "nonsevere." [AR 21]  Later in the analysis, the ALJ noted the Plaintiff's testimony concerning his mental health [AR 24], and opined that Plaintiff's suicide attempt in 2007 was prompted by a family dispute and intoxication [AR 25]. However, the ALJ mentioned nothing more about Plaintiff's mental impairments in formulating his RFC nor in determining whether Plaintiff had a disability at Step 5.   In fact, the RFC itself appears to include limitations for only the Plaintiff's physical impairments; but, without any indication from the ALJ as to whether he considered Plaintiff's mental impairments, the Court cannot determine whether the RFC takes such impairments into account.  Therefore, the Court must conclude such omission is reversible error under prevailing law.  *See Wells*, 727 F.3d at1069 ("In his RFC assessment, the ALJ must consider the combined effect of *all* medically determinable impairments, whether severe or not.") (emphasis in original).

---

[3]In so agreeing, the Court does not find that the ALJ erred at Step 2; rather, the Court simply concludes that it need not engage in a Step 2 analysis under the circumstances of this case.

Because there is no indication the ALJ considered the Plaintiff's mental impairments of mood disorder, nos and PTSD at stages of his analysis subsequent to Step 2, particularly in formulating the RFC, the Court will reverse the ALJ's decision on this issue and remand to the Commissioner for further consideration. *See Sissom v. Colvin*, 512 F. App'x 762, 769 (10th Cir. 2013) (citing *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir.1988) and *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir.2004)) (cautioning the ALJ on remand to "make adequate findings" to assure that the correct legal standards are invoked and to ensure a meaningful appellate review).

## IV.     Whether the ALJ's Step 5 Determination is Supported by Substantial Evidence

The Court "address[es] only so much of Plaintiff's arguments as are sufficient to require reversal." *See Cross v. Colvin*, 25 F. Supp. 3d 1345, 1348 n.1 (D. Colo. 2014). The Court expresses no opinion as to the Plaintiff's remaining argument and neither party should take the Court's silence as implied approval or disapproval of the argument. *See Watkins*, 350 F.3d at 1299 ("We will not reach the remaining issues raised by appellant because they may be affected by the [administrative law judge's] treatment of the case on remand."). The Court also does not suggest a result that should be reached on remand; rather, the Court encourages the parties and the ALJ on remand to consider fully and anew the evidence and the issue remanded by this order. *See Kepler v. Chater*, 68 F.3d 387, 391-92 (10th Cir. 1995) ("We do not dictate any result [by remanding the case]. Our remand simply assures that the correct legal standards are invoked in reaching a decision based on the facts of the case.") (citation and quotation marks omitted).

## CONCLUSION

24

In sum, the Court finds the ALJ properly analyzed Plaintiff's credibility and properly applied the treating physician rule and, thus, affirms the ALJ's decision on these bases. However, the Court also finds the ALJ failed to mention the Plaintiff's medically determinable mental impairments after Step 2 and, thus, the Court cannot determine whether the ALJ properly considered both severe and nonsevere impairments for his RFC. In this regard, the ALJ's decision is reversed and remanded to the Commissioner for further explanation and consideration.

Therefore, the decision of the ALJ that Plaintiff Maurice Ambrose Gaye was not disabled is **affirmed in part and reverse in part, and remanded** to the Commissioner for further consideration and/or clarification in accordance with this order.

Dated at Denver, Colorado this 16th day of December, 2015.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge

25